**FILED**

APR 20 2026

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

PAUL J. PORTER, an individual, and BIG SQUARE MEDIA / RABID LOVE LLC,

Plaintiffs,

v.

HORROR CENTRAL, VA MEDIA (VALLEYARM), ALEXANDER NELSON-SHINE,

ACORT INTERNATIONAL / MAXIM MEDIA MARKETING INC. dba BRAIN DAMAGE

FILMS, GRAVITAS VENTURES LLC, SHOUT! FACTORY, LLC, and DOES 1–10,

Defendants.

Case No.: **CV26-3311 AGT**

**COMPLAINT FOR COPYRIGHT INFRINGEMENT, BREACH OF CONTRACT,**

**ACCOUNTING, AND UNJUST ENRICHMENT (Demand for Jury Trial)**

**INTRODUCTION**

1. This is an action for copyright infringement under 17 U.S.C. § 501, breach of the 2013
License Agreement, and related claims. Defendants and those acting under their authority have
continued to distribute and profit from Plaintiff's entire copyrighted motion picture *Rabid
Love* (2013) for more than four years after all rights automatically reverted to Plaintiff on
January 1, 2022.

**JURISDICTION AND VENUE**

2. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

1

3. Venue is proper in this District pursuant to 28 U.S.C. § 1400(a) because Defendants VA Media and Alexander Nelson-Shine consented to the jurisdiction of this Court in their YouTube counter-notification, and YouTube's principal place of business is located in this District. Defendants Acort, Gravitas Ventures, and Shout! Factory are subject to personal jurisdiction in this District because they have purposefully availed themselves of the California market through the distribution and monetization of motion pictures via YouTube and other platforms.

**PARTIES**

4. Plaintiff Paul J. Porter is the writer, director, and sole rights holder of *Rabid Love* through Big Square Media / Rabid Love LLC, with a principal place of business in Dripping Springs, Texas.

5. Defendant Horror Central is the YouTube channel that uploaded the infringing video.

6. Defendants VA Media (Valleyarm) and Alexander Nelson-Shine are located in Sydney, Australia, and submitted the false counter-notification at issue.

7. Defendant Acort International / Maxim Media Marketing Inc. dba Brain Damage Films is an Arizona corporation that was the original licensee under the 2013 License Agreement.

8. Defendant Gravitas Ventures LLC is a U.S. entity that purportedly received and then assigned rights in *Rabid Love* after the License Agreement had already terminated.

9. Defendant Shout! Factory, LLC is a U.S. entity that received the purported assignment of *Rabid Love* (and thousands of other titles) from Gravitas Ventures on or about April 4, 2025.

**FACTUAL ALLEGATIONS**

2

10. Plaintiff is the exclusive copyright owner of the motion picture *Rabid Love*. Plaintiff's copyright was registered on May 15, 2013 (Registration No. TXu001868387).

11. On July 16, 2013, Plaintiff (as Licensor) entered into a License Agreement with Acort International (and its affiliates, including Maxim Media Marketing Inc. dba Brain Damage Films / BRI) granting a seven-year term only (Section 3.1 of the Agreement).

12. Section 3.2 of the Agreement expressly states: "Upon any expiration or termination of this Agreement, all rights granted to Licensee hereunder shall automatically terminate and shall automatically revert to Licensor, and Licensee shall thereafter have no further rights to use or exploit the Titles..."

13. The License Agreement was never renewed and terminated effective January 1, 2022. All rights, including any sublicenses, automatically reverted to Plaintiff.

14. Despite the clear termination, Acort and parties acting under its authority (including Gravitas Ventures and Shout! Factory) have continued to distribute and monetize *Rabid Love* without any accounting or payment to Plaintiff for more than four years.

15. On or about April 4, 2025, Gravitas Ventures LLC executed a bulk "Assignment and Assumption Agreement" purporting to transfer rights in 3,333+ titles—including *Rabid Love* (listed as entry 00517)—to Shout! Factory, LLC. That agreement was recorded with the U.S. Copyright Office on August 28, 2025 (Document V15037D837). This assignment conveyed no valid rights in *Rabid Love*.

3

16. Defendants uploaded a complete copy of Plaintiff's film to YouTube at https://www.youtube.com/watch?v=XDmafymqDMU and filed a false counter-notification claiming rights through the expired Acort/BRI chain.

17. Plaintiff has received no accounting statements and no payments for any revenues generated from *Rabid Love* since January 1, 2022. Plaintiff is informed and believes that Defendants have earned substantial profits from the unauthorized exploitation of the film during this period.

18. The infringement and breach are willful.

**CLAIMS FOR RELIEF Count I – Copyright Infringement (17 U.S.C. § 501)**

19. Defendants' unauthorized reproduction, distribution, and public performance of Rabid Love constitute direct copyright infringement of Plaintiff's registered copyright.

20. The infringement is willful.

**Count II – Breach of Contract (Arizona Law)**

21. The 2013 License Agreement is a valid and enforceable contract.

22. Acort breached the Agreement by failing to cease exploitation after termination, failing to account for revenues, and failing to pay Plaintiff any royalties or profits earned after January 1, 2022.

23. Plaintiff has been damaged in an amount to be proven at trial.

**Count III – Accounting and Unjust Enrichment**

24. Defendants have been unjustly enriched by retaining revenues and profits properly belonging to Plaintiff.

4

25. Plaintiff is entitled to a full accounting of all revenues, license fees, royalties, and profits generated from *Rabid Love* from January 1, 2022 to the present, and to disgorgement of all such amounts.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Issue a **temporary restraining order and preliminary injunction** requiring immediate removal of the video at https://www.youtube.com/watch?v=XDmafymqDMU and enjoining all Defendants from any further distribution or exploitation of *Rabid Love*;

B. Award **actual damages**, **infringer's profits**, and/or **statutory damages**;

C. Order a **full accounting** of all revenues and profits earned by any Defendant from *Rabid Love* since January 1, 2022;

D. Award prejudgment interest, costs, and reasonable attorney's fees; and

E. Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL** Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 13, 2026

Respectfully submitted,

/s/ **Paul J. Porter** Paul J. Porter, Pro Se
Big Square Media / Rabid Love LLC
1780 Live Oak Canyon Road
Dripping Springs, Texas 78620
pauljporter19@gmail.com
310-741-1217

5

**EXHIBIT A**

**Recorded Copyright Registration Number TXu 1-868-387 effective May 15, 2013**

Registration Number

# TXu 1-868-387

**Effective date of registration:**

May 15, 2013

## Title

Title of Work: Rabid Love

## Completion/Publication

Year of Completion: 2013

## Author

■       Author:   Paul J Porter

Author Created:   text

Work made for hire:   No

Citizen of:   United States        Domiciled in:   United States

Year Born:   1980

## Copyright claimant

Copyright Claimant:   Paul Porter

401 N Pass Ave #15, Burbank, CA, 91505

## Rights and Permissions

Organization Name:   Rogue Taurus Productions LLC

Name:   Paul J Porter

Email:   paul@roguetaurus.com        Telephone:   310-741-1217

Address:   401 N Pass Ave #15

Burbank, CA 91505   United States

## Certification

Name:   Paul J. Porter

Date:   May 15, 2013

**EXHIBIT B**

**Recorded Copyright Office Document V15037D837 (Assignment and Assumption Agreement – Gravitas Ventures LLC to Shout! Factory, LLC)**

This exhibit is an 85-page bulk recorded document that lists *Rabid Love* as entry 00517 among 3,333+ other titles. The full document is available in electronic form. The attached pages show:

- The recording date and document number
- The parties to the assignment
- The specific listing of "Rabid Love"

# Certificate of Recordation



This is to certify that the attached document was recorded on the date and in the place shown below.

This certificate is issued under the seal of the United States Copyright Office.

August 28, 2025

Date of Recordation

15037                          837

Volume                         Doc.No.

# Copyright

---

**Document Number:**
V15037D837

**Entire Copyright Document:**
V15037 D837 P1-128

**Type of Document:**
Recorded Document

**Date of Recordation:**
2025-08-28

**Date of Execution:**
04Apr25; 04Apr25

**Party 1:**
Gravitas Ventures LLC

**Owner:**

**Party 2:**
Shout! Factory, LLC

**Author:**

**Notes:**
ASSIGNMENT AND ASSUMPTION AGREEMENT - Gravitas Ventures -w-
Shout! Factory.

**Title:**
Dollman & 3332 other titles ;Motion picture.

**List of Works:**
00001 Dollman ;Motion picture.
00002 Subspecies 2 ;Motion picture.
00003 Subspecies 3 ;Motion picture.
00004 The Creeps ;Motion picture.
00005 Vampire Journals ;Motion picture.
00006 Head of the Family ;Motion picture.
00007 Outfoxed-Rupert Murdoch's War ;Motion picture.
00008 Uncovered-The War on Iraq ;Motion picture.
00009 Walmart-The High Cost of Low Pr ;Motion picture.
00010 Iraq For Sale ;Motion picture.
00011 Subspecies ;Motion picture.

00492 Little Tin Man ;Motion picture.
00493 Longest Week, The ;Motion picture.
00494 Lost Time ;Motion picture.
00495 Love Eternal ;Motion picture.
00496 Love Me ;Motion picture.
00497 Lucky Bastard ;Motion picture.
00498 Lust for Love ;Motion picture.
00499 Magic Life, The ;Motion picture.
00500 Malignant ;Motion picture.
00501 Merry In-Laws, The ;Motion picture.
00502 Monster Madness - Golden Age of ;Motion picture.
00503 Murder of Couriers ;Motion picture.
00504 My Girlfriend's Boyfriend ;Motion picture.
00505 Nfinity Champions League - Vol1 ;Motion picture.
00506 No One Will Know ;Motion picture.
00507 NSFW ;Motion picture.
00508 Oy Vey! My Son is Gay ;Motion picture.
00509 Paranormal Prisons ;Motion picture.
00510 Perfect Sisters ;Motion picture.
00511 Pervertigo ;Motion picture.
00512 Phantom of the Opera, A ;Motion picture.
00513 Ping Pong Summer ;Motion picture.
00514 Plastic Galaxy ;Motion picture.
00515 Playdate ;Motion picture.
00516 POE - Project of Evil ;Motion picture.
00517 Rabid Love ;Motion picture.
00518 Redline ;Motion picture.
00519 Republic of Two, The ;Motion picture.
00520 Rise and Rise of Bitcoin, The ;Motion picture.
00521 Run Like Hell ;Motion picture.
00522 Scrapper ;Motion picture.
00523 Secret History - Making of Amer ;Motion picture.
00524 She Loves Me Not ;Motion picture.
00525 Sherlock Holmes and the Shadow ;Motion picture.
00526 Shock Value ;Motion picture.
00527 Showrunners ;Motion picture.
00528 Sick Birds Die Easy ;Motion picture.
00529 Silent Retreat ;Motion picture.
00530 Slaughter Daughter ;Motion picture.
00531 Sledge ;Motion picture.

**EXHIBIT C**

## Full 2013 License Agreement with Acort

This exhibit is the original distribution agreement between Paul Porter and Acort International, applicable paragraphs are 3.1 and 3.2

# ACORT INTERNATIONAL

**Corporate Address:    5348 Vegas Drive, Las Vegas, NV 89108   U.S.A.**
**Mailing Address:    6929 N Hayden Road, Suite C4-246, Scottsdale, AZ   85250   U.S.A.**
**P: +1.480.966.4070                F: +1.480.966.4570**
**www.AcortInternational.com**

## LICENSE AGREEMENT

This License Agreement (the "Agreement") is made and entered into as of this 16th day of July, 2013, by and between,

| Licensor |
| --- |
| **Rabid Love LLC** |
| Contact: Paul J. Porter |
| 401 N Pass Avenue #15 |
| Phone: (310) 741-1217 |
| Email: Paul@RogueTaurus.com |

| Licensee |
| --- |
| **Acort International** |
| 6929 N. Hayden Rd, Suite C4-246 |
| Scottsdale, AZ 85250 USA |
| O : +1.480.966.4070 x11 |
| F : +1.480.966.4570 |
| Contact:  Darrin Ramage |
| Email:  Darrin@eMaximMedia.com |

A.  WHEREAS, Licensor is the exclusive copyright owner of completed feature film(s) that are listed in Exhibit "A" ("Titles") and the related ancillary rights and materials including but not limited to, trademarks, art work, promotional materials, trailers, (the "Delivery Materials")(Titles and Delivery Materials will be collectively referred to as Titles throughout this Agreement).

B.  WHEREAS Licensee directly and through its related companies, subsidiaries and affiliates that include Maxim Media Marketing, Inc. (collectively "Licensee") wishes to secure the exclusive right to distribute, promote, license, sublicense or otherwise exploit the Titles worldwide, in all markets and on all media (excluding BluRay Disc and theatrical within North America only), under the terms and conditions set forth within this Agreement.

In consideration of the mutual covenants contained herein and for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.  **RIGHTS**

   1.1.    Rights Granted. Subject to the terms and provisions of this Agreement, Licensor hereby grants to Licensee the following rights (the "Licensed Rights"):

      1.1.1Rights. an exclusive, license to promote, distribute, manufacture, transmit, exhibit, stream, store, broadcast, license, sublicense, advertise, duplicate, promote, perform, telecast, sell and otherwise exploit the Titles.

      1.1.2  Clear Title.  The rights granted by Licensor are free and clear from any and all restrictions, claims, encumbrances or defects of any nature.  Licensor agrees that it will not commit or fail to perform any act which could or will encumber, diminish, impair or jeopardize these rights.

PJP

1.1.3  Music.  Licensor grants Licensee the right to use and perform any and all music, lyrics and musical compositions as it is contained in the Titles and recorded in the Titles's soundtrack for the purposes of promoting, selling, marketing and advertising the Titles. Licensor agrees that it has acquired all necessary rights to use the music contained in the Titles for all purposes considered under this Agreement.

1.1.4  Editing.  Licensee may find it beneficial to change the Titles name for better positioning and/or marketing benefit. The Titles names shall not be changed without the parties agreeing to any such name change. The Titles may not be changed without Licensor's prior written approval. The film will not be altered, re-edited or changed in any way from the way it is received on the sub-master without the parties agreeing to the alterations, re-editing, or changes.  Written approval from Licensor, in both cases, is required.

1.1.5  Advertising and Publicity.  Licensor grants Licensee the exclusive right to publicize, advertise and exploit the Titles throughout the Territory and Markets during the term of this Agreement.  Licensor also grants Licensee the right to insert any advertising of a separate product at the beginning or end of any Title that is not in conflict with Licensor's product, provided Licensee has been notified by the Licensor in writing of the conflict.

1.1.6  Rights Reserved.  Licensor reserves any right to the Titles not expressly conveyed to Licensee under this Agreement.

1.1.7  Credits.  Licensor grants Licensee the right to an opening credit slate to appear before the Title's title and a closing credit slate to appear after the copyright notice.

2.    **TERRITORY**.

2.1.    Licensee is granted the exclusive worldwide right to distribute the Titles (the "Territories").

3.    **TERM**.

3.1.    The initial term of this Agreement (the "Term") shall commence on the date all Materials are accepted ("Materials" are those items set forth in Exhibit "A" of this Agreement) and shall continue thereafter for Seven (7) years from this date of acceptance. During the term of this Agreement the Licensee shall not enter into any agreement on behalf of the Licensor that equals or exceeds ten (10) years without receiving the Licensor's prior written consent.

3.2.    Upon any expiration or termination of this Agreement, all rights granted to Licensee hereunder shall automatically terminate and shall automatically revert to Licensor, and Licensee shall thereafter have no further rights to use or exploit the Titles, in whole or in part, in connection with the production, promotion, distribution and/or sale of the Titles in any format or for any other purpose or in any other manner with the single exception set forth in Section 10.2 of this Agreement.

4.    **COMPENSATION**.

4.1.    Consideration.  As full and complete consideration for the rights granted by Licensor to Licensee hereunder, Licensee will be entitled to and shall receive a fee of thirty five percent (35%) of the Net Revenue derived from the exhibition, distribution and exploitation of the Titles by Licensor throughout the Territory contracted during the Term of this Agreement (hereafter referred to as the "Distribution Fee").

PJP

(a) <u>Net Revenue.</u> Gross Revenue minus any and all Distribution Expenses as defined herein. Gross Revenue shall mean all amounts actually received by Licensee in United States dollars, from the exploitation of the Titles in the Territory without any deductions there from.

(b) <u>Distribution Expenses.</u> Licensee will be allowed to recoup, before any payments are due or made to Licensor, any and all hard costs, including but not limited to; advertising, promotional, marketing, printed material, duplication costs (sub-masters and screeners), market attendance fees (not to exceed 10% of sale price) dependent on actual sale taking place at a given market, and/or any portion thereof which are directly in connection to the sales and distribution of the Titles. Licensee will be responsible for its administrative and operating expenses such as rent, telephone, office staff and utilities. Licensee agrees to keep expenses capped at Twenty Thousand Dollars (US$20,000.00).

(c) <u>Recoupable Advance.</u> Licensee will pay Licensor a five hundred dollar ($500.00) advance on royalty upon Licensee's receipt and approval of all Delivery Materials. Delivery Materials must pass full QC process before Licensee will approve delivery. This advance is considered a recoupable expense.

The Distribution Fee shall be payable to Licensor on executed license or sale agreements, where Licensee has received full payment from the contracting third-party. All payments will be held by Licensor for a 60 day period after Licensor's receipt from the third-party to permit the third-party to perform its needed quality control processes to determine if the materials are acceptable for the third-party's use ("QC"). The Distribution Fee will be paid upon Licensee's receipt of the payment, whether the third-party payments are received by Licensor before or after the expiration or Termination of this Agreement. If Licensee has not been paid by the third-party or Licensee's materials do not pass QC, Licensee will not be due any payment until the third-party's payment is received or Licensee resolves the QC issues.

4.2.    <u>Royalty Statements and Payments.</u> Royalty statements are reported quarterly. Reports will be delivered via email, with payments delivered by USPS, within forty-five (45) days of ending period. Licensee shall deliver to Licensor a statement setting forth all sales, if any, for the preceding three (3) month period. Statements periods are January 1st – March 31st, April 1st – June 30th, July 1st – September 30th and October 1st – December 31st. Each such statement shall be accompanied by any royalty payments due as reflected in the Statement.

5.    <u>CREDIT.</u>

With respect to any copies of the Titles produced or issued in any format by or on behalf of Licensee, Licensee shall accord Licensor substantially the following credit on all commercial and promotional copies as follows:    Licensee shall include credits on places which conform with current industry customs.

5.1.    Licensee shall contractually obligate all third parties with whom Licensee may enter into agreements with respect to the Titles to accord Licensee and Licensor the foregoing credit and copyright notice as set forth above.

5.2.    Credits for the Cast & Crew and Cover/Main Photograph will be provided by Licensor and will appear on all printed and/or electronic materials relating to the Titles, as permitted and reasonably available.

2                                                                Initial ꟼↃꟼ    ꞇᴇᴄ‾

6. **LICENSOR'S REPRESENTATION AND WARRANTIES; INDEMNIFICATION**.
Licensor represents and warrants to Licensee that it has full right, power and authority to enter into and perform its obligations under this Agreement.

7. **LICENSEE'S REPRESENTATIONS, WARRANTIES AND COVENANTS**

7.1     Licensee represents and warrants to Licensor that it has full right, power and authority to enter into and perform its obligations under this Agreement.

7.2     Licensee will use commercially reasonable efforts to exploit the license granted herein, including without limitation by attempting to create and develop a market for the Titles, by promoting, distributing and licensing rights the Titles so as to attempt to maximize the Sales Royalty, and by securing and making use of adequate personnel for the exercise of its rights under this Agreement.

7.3     Licensor acknowledges and agrees that Licensee makes no representation, warranty, guaranty or agreement as to any minimum amounts of monies expended for distribution, advertising, publicizing or exploitation of the Titles.

7.4     Licensor further acknowledges and agrees that Licensee makes no express or implied representation, warranty, guaranty or agreement as to the Gross Revenue to be derived from the Titles through Licensee's distribution efforts.

8. **COPYRIGHT.**
8.1. Ownership. Licensor confirms it has all ownership in and to all copyrights pertaining to the Titles throughout the world, including the right to secure copyright registration anywhere in the world with respect to all copyrights in the Titles. Licensor agrees to transfer any copyright in the Titles to Licensee during the term of this Agreement in accordance with the terms of this Agreement. The Titles shall contain a copyright notice complying with all copyright laws of the United States.

8.2. Assignment of Copyright. Licensor agrees to assign Licensee all copyrights for the term of this Agreement for purposes of protecting and defending Licensee's rights granted in this Agreement. Licensor agrees to this assignment's registration with the United States Library of Congress Copyright Office. Licensee agrees to take all reasonable steps to protect the copyrights from infringement by unauthorized parties.

8.3. Limit of Liability. Licensee is not liable, responsible or accountable in damages or otherwise for any infringement of the Licensor's copyrights.

9. **INDEMNITY.**
9.1. Licensor will at all times indemnify, defend and hold harmless Licensee, its partners and all affiliated companies and their respective officers, directors, partners, shareholders, employees, agents and representatives from and against any claim, demand, liability or judgment, including, without limitation, reasonable attorneys' fees and court costs, arising out of any breach of representation, warranty or other obligation or provision hereof or arising out of the use of the Titles in accordance with this Agreement or arising out of the content of the Titles to the extent that such claim, demand, liability or judgment is based upon alleged libel, slander, defamation, invasion of the right of privacy, or violation or infringement of copyright, literary or music rights or otherwise arising out of the content of the Titles as furnished by Licensor to Licensee. This indemnity shall survive termination of this Agreement.

3                                                    Initial __RJP__   __TEV__

13.6.    Assignment. This Agreement may be assigned to any other person or entity only with the prior written consent of Licensor, provided that such consent is not unreasonably withheld.

13.7.    Binding Nature. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns.

13.8.    Amendment. This Agreement may not be modified or amended except in writing signed by both parties hereto.

13.9.    Counterparts. This Agreement may be signed in two counterparts delivered via facsimile with the same effect as if the signatures of both parties were on the same instrument.

13.10.    Construction. This Agreement shall not be construed against any party hereto by virtue of the fact that said party drafted this Agreement, or had this Agreement drafted.

13.11.    Severability. If any term, provision, covenant or condition of this Agreement or any portion thereof is held by a court of competent jurisdiction to be invalid, void, or unenforceable, then the remaining terms, provisions, covenants, and conditions of this Agreement, and portions thereof, shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

13.12    Right to Review. Each party hereto acknowledges that they have had the right to have this Agreement reviewed by legal counsel of their choice prior to their execution of same.

13.13    Gratis Copies.    Licensee shall supply Licensor with 30 gratis copies of the final retail-ready North America DVD upon release. Additional copies may be purchased by Licensor for $3.00 per unit.

## 14.    ARBITRATION CLAUSE.

Any controversy or claim arising out of or related to this Agreement and to any part of it, including, but not limited to this Paragraph on arbitration, and to the performance, breach, interpretation or enforceability hereof, and all claims of fraud in the inducement of this Agreement and all claims for rescission of this Agreement, or any part of this Agreement, shall be settled by arbitration. Such arbitration shall be held in the County of Maricopa, Arizona, unless otherwise agreed by the parties in writing, and heard and settled according to the commercial rules of the American Arbitration Association. The arbitrator may make any order, decision, determination or award which he deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, requiring any party to perform any of its obligations or undertakings. The arbitrator may also make any interim order, decision, determination, or award he deems necessary to preserve the status quo until he can render a final order, decision, determination or award. Any final or interim order, decision, determination or award made by the arbitrator shall be conclusive and binding upon the parties and judgment upon any such order, decision, determination or award may be enforced and entered in any court having jurisdiction thereof. the prevailing party will have the right to collect from the other party its reasonable attorney's fees, any and all costs, expenses and other disbursements incurred in enforcing this Agreement plus interest at the highest legally permissible rate.

[SIGNATURE PAGE TO FOLLOW]

6                                                                    Initial _P𝒥P_    _T𝒆ᵥ_

In witness whereof, the parties hereto have executed this Agreement as of the date signed below.

**Licensor**
**Rabid Love LLC**
Paul J. Porter

**Licensee**
**Acort International**
Darrin G. Ramage

_____
Signature

_____
Signature

PAUL  J.  PORTER
_____
Print

Darrin G. Ramage
_____
Print

PRODUCER/DIRECTOR
_____
Title

President
_____
Title

JULY  27, 2013
_____
Month/Day/Year

July 28, 2013
_____
Month/Day/Year

Digitally signed by Darrin Ramage
DN: cn=Darrin Ramage, o=Maxim Media, ou,
email=Darrin@eMaximMedia.com, c=US
Date: 2013.07.29 11:59:49 -07'00'

7

Initial PJP   TER

**EXHIBIT A**
**LISTING OF TITLES**

    **TITLE**
1. Rabid Love
2.
3.
4.
5.

8

Initial _ﮔﺎﭖ_  _ﺎﯾﺎﻟ_

SUMMARY OF DELIVERY REQUIREMENTS FOR FEATURE FILMS AND ACCOMPANYING MATERIALS
Revised July 1, 2013

Note: If you cannot deliver any of the items requested below please tell your Licensee Representative. Agreement will not commence until a Licensee Representative has approved all assets.

QC: ALL FEATURE MASTER FILES MUST UNDERGO A 100% QC TEST BY A REPUTABLE POST FACILITY

Our job is to distribute your film via as many outlets/clients as possible. We do this by providing our clients with materials that meet their specifications and requirements. These specifications and requirements are broadcast industry standards used throughout the industry, and if not submitted correctly may result in the loss of a deal or the denial of your film for placement into various outlets (VOD/iTunes/television broadcasts, etc). In order for us to make your film available to all of our clients, you must first make sure that your deliverables meet the requirements set forth below and they have been QC'd by a reputable facility. It is imperative that when your film is QC'd and found to have issues that those issues are resolved before you submit to us your final master. Keep in mind that if you fail QC and the issues are not resolved your film may not be licensed. If you fail QC now then you will fail a QC required by many of our clients later, hence delivering your film in the best possible quality now is a must! Although we may be able to answer general questions we will not be able to provide assistance with any technical questions related to QC reports deemed as failing.

If you need assistance with video/audio delivery formats please consult your software's documentation, internet forums, or a professional.

If you fail to meet these requirements we may return your materials and request that you correct and re-send them at your own cost or we may not license your film.

We recommend Fotokem as a suggested QC facility and have worked out a special price for our licensees of $160.00 USD, payable to Fotokem prior to the licensing of your film. Your licensing representative will communicate this process to you in more detail once you notify us that your drive with all materials is prepared and ready to ship.

We accept the following delivery format:

⅄ One external hard drive (hard disk drive in an external enclosure with Firewire and/or USB connections, otherwise known as a hard drive or HDD). Files transferred from Licensor's original Master sources subject to Licensee's quality evaluation and approval. See below for required files and their respective formats/requirements. Include HDD's power cord if applicable.

**Hard drive will be kept in MMI vault for the full duration of the agreement.**
**MMI is not responsible for any theft, loss or damage – Do not send your only copy!**

LABELING

Make sure that the HDD's enclosure is labeled with all following information:
1) Title
2) Feature's aspect ratio, resolution, frame rate and file size

9

Initial $P\Delta P$    $TEE$

3) TRT (Total run time of feature)
4) Drive format (PC(preferred) or Mac)
5) Production company and contact information

In addition to external labeling please make sure all files on the drive are well organized and clearly labeled. All audio and video files should include the feature title in the filename.

**Checklist summary of requested materials:**
All items are required unless otherwise noted with "if available".
·See the sections below this one for more detailed information/requirements for each.
☐ Feature master video file (QC'd)
☐ At least two different trailers
☐ Separate M&E ONLY audio track (if available)
☐ Separate audio commentary track for DVD (if available)
☐ Bonus materials for DVD (if available)
☐ At **least** 20 images (frame grabs, production stills, etc)
☐ Any other related artwork (if available)
☐ Dialog sheets and/or accurate script
☐ Music cue sheets
☐ Music clearance/release sheets (if applicable)
☐ Copyright paperwork (if available)
☐ Information/metadata spreadsheet (request the template if it didn't come with this document)

**Specific format requirements for requested materials:**
**• Feature master video file (must be QC'd prior to delivery):**
**File format:**
The preferred format/coded is Apple ProRes 422 HQ  Other acceptable formats are uncompressed AVI or Quicktime – The larger the file the better (but **do not upconvert** or output at a higher data rate than your source). Should be 15GB at the very minimum for SD.
MUST BE NTSC – **We do not accept PAL formatted video.**
**Video properties:**
Frame rate: Should match your source footage (23.976, 24, 29.97, or 59.94)
Interlacing: Should match your source footage
Format/codec: See above (File Format).
Resolution/Aspect Ratio/Data rate: Depends on your source footage. Consult the chart below.
**Audio properties:**
Audio bitrate should be the highest possible, relative to your source or the compression settings if your master is compressed.  Separate audio files (commentary track, M&E, etc) should also be the highest quality and bitrate, preferably in uncompressed WAV format or AIFF. **Make sure your master file includes the main audio mix with dialog.**
Audio levels should optimally be around -6db and no clipping should occur.

➡ **Do not letterbox widescreen features** ⬅

10                                                          Initial  PJP    LEE

9.2. Licensee will at all times indemnify, defend and hold harmless Licensor, its partners and all affiliated companies and their respective officers, directors, partners, shareholders, employees, agents and representatives from and against any claim, demand, liability or judgment, including, without limitation, reasonable attorneys' fees and court costs, arising out of any breach of representation, warranty or other obligation or provision hereof or arising out of the use, distribution, licensing or sublicensing of the Titles not in accordance with this Agreement or arising out of any material Licensee may add to the Titles.

9.3. In connection with the indemnification listed in this Section, each party must indemnify the other only if such other party claiming indemnity gives the indemnifying party prompt notice of any claim or litigation to which indemnity may apply; it is agreed the indemnifying party shall have the right to assume and fully control the defense of any or all claims or litigation to which its indemnity applies and that the indemnified party will cooperate fully (at the cost of the indemnifying party) with the indemnifying party in such defense and in the settlement of such claim or litigation.

10.  **DEFAULT AND TERMINATION; REMEDIES.**
10.1.   In addition to any other event of default under this Agreement, each of the following will constitute an event of default hereunder by Licensee:

10.1.1.  Licensee's failure to make any payment due hereunder when due, and

10.1.2.  Licensee's breach of any of its other obligations under this Agreement, if such failure to make payment or other breach is not cured following written notice to Licensee with ten (10) business days to cure such failure or breach ("Cure Period"); or

10.1.3.  An assignment by Licensee for the benefit of creditors, or Licensee's seeking relief under any bankruptcy law or similar law for the protection of debtors, or suffering a bankruptcy petition to be filed against it or a receiver or trustee to be appointed for all or substantially all of its assets, if the same is not removed within thirty (30) days ("Cure Period").

10.2.   If, after an event of default, and upon expiration of the Cure Period, Licensor or Licensee elects to exercise their respective rights of termination hereunder, the terminating party shall give the other party hereto written notice thereof (the "Termination Notice"). Such Termination Notice shall be immediately effective, and neither party hereto thereafter shall have any further rights of cure or reinstatement after such Termination Notice is given except that Licensee's obligations to pay Licensor as set forth in Paragraphs 4.1. and 4.2. shall continue until Licensee's inventory of copies of the Titles have been either returned to Licensor or depleted. If, upon any expiration or termination of this Agreement, Licensee has an inventory of copies of the Titles, then Licensee may take up to six (6) months after the date of expiration or termination in which to dispose of such copies under then-existing contracts or agreements. In the event this Agreement is terminated by either party hereto, the Licensed Rights granted hereunder by Licensor to Licensee shall be fully and finally terminated, at which time Licensee will pay all remaining money owed to, and all rights will revert back to, Licensor.

10.3.   Any waiver by either party of any breach of this Agreement shall be made in writing and shall not be deemed a waiver of any prior or subsequent breach hereof. All remedies of either party shall be deemed cumulative and the pursuit of any one remedy shall not be deemed a waiver of any other remedy. In the event of any breach or alleged breach of this Agreement by Licensee, in addition to any other

4                                                              Initial P J P

remedy which may be available to Licensor at law or in equity, Licensor shall be entitled to seek injunctive or other equitable relief with respect thereto.

11. **ACCOUNTING**.
Annually, during Regular Business Hours (defined as Monday through Friday, 9:00 a.m. to 5:00 p.m. except for generally recognized business holidays), Licensor shall have the right to audit Licensee books and records related to the Picture at Licensor's sole expense by a certified public accountant, at Licensee offices during regular business hours, following thirty (30) day prior written notice. Licensor shall not request an audit more often than once every twelve (12) months following completion of a prior audit. Licensor shall not question, audit, or seek revision of any statement after twelve (12) months have passed from the date that statement was prepared, unless written objection to that statement was received by Licensee before expiration of the twelve-month period. Licensee shall not be obligated to retain substantiation for any statement twenty-four (24) months after its preparation. Notwithstanding the forgoing, no statement shall be rendered unless monies are owed Licensor.

12. **INDEPENDENT CONTRACTOR RELATIONSHIP**.
The relationship of the parties is that of independent contractors and nothing contained in this Agreement shall be construed as establishing an employment, partnership, joint venture or other similar relationship and neither party hereto shall be liable for any obligations incurred by the other party except as expressly provided herein. Unless otherwise required by applicable law, Licensee shall not withhold from Licensor's compensation any amounts for social security or federal or state income taxes, which obligations are solely that of Licensor.

13. **MISCELLANEOUS**.
13.1. <u>Integration</u>. This Agreement contains the entire understanding of the parties relating to the subject matter hereof and supersedes any prior understanding of the parties. Each party acknowledges that no representation or agreement not expressly contained in this Agreement has been made to any party hereto or any of such parties' agents, employees or representatives.

13.2. <u>Governing Law</u>. This Agreement shall be construed and interpreted in accordance with the laws of Arizona applicable to contracts made and fully performed within Arizona.

13.3. <u>Legal Fees</u>. In any dispute under this Agreement between the parties that requires legal action, including Arbitration, to resolve, the prevailing party will have the right to collect from the other party its reasonable attorney's fees, any and all costs, expenses and other disbursements incurred in enforcing this Agreement plus interest at the highest legally permissible rate.

13.4. <u>Notices</u>. All notices hereunder shall be in writing and sent by certified or registered mail (return receipt requested), facsimile (with telephonic confirmation), email (with confirmation of receipt by return email), or messenger (with receipt of delivery) to the addresses set forth above. Any such notice sent hereunder shall be deemed served or received upon delivery, except that notices sent by facsimile shall be deemed delivered when sent. Each party may designate in writing such other place or places that notices may be given hereunder; provided, however, that any notice of change of address shall only be effective upon actual receipt thereof by the other party.

13.5. <u>Headings</u>. Paragraph headings, as used in this Agreement, are for convenience only and are not a part hereof, and shall not be used to interpret any provision of this Agreement.

5                                                                      Initial _P\P_  _____

| Source Footage | Output Settings | | | |
|---|---|---|---|---|
| 1080P HD | Resolution | Aspect Ratio | Bit rate | Notes |
| | 1920x1080 | 16x9 (1.0) | >50megabits per second | Progressive |
| 1080i HD (HDV) | Resolution | Aspect Ratio | Bit rate | Notes |
| | 1440x1080 | 16:9 (1.3) | >25megabits per second | |
| 720P HD | Resolution | Aspect Ratio | Bit rate | Notes |
| | 1280x720 | 16:9 (1.0) | >25megabits per second | Progressive |
| Widescreen SD | Resolution | Aspect Ratio | Bit rate | Notes |
| | 720x480 | 16:9 (1.21) | >25megabits per second | |
| Standard SD (4x3) | Resolution | Aspect Ratio | Bit rate | Notes |
| | 720x480 | 4:3 (0.9) | >25megabits per second | Full-frame only |

(The above chart is only a guide.  We will accept any industry standard format.)

**• Trailer:**
<u>Video format:</u>
Consult the section above for formatting requirements.  Trailers are used for many purposes including YouTube, websites, screener DVDs, and television broadcast.
<u>Content/Presentation:</u>
Include at least two different trailer versions.  They should all be "clean" (no gratuitous violence, nudity, or language), however if you have a "dirty" trailer as well please include it!
• <u>Trailer 1</u>:
60-90 seconds to be included on DVDs, web, etc.  For consumers/horror fans.
• <u>Trailer 2</u>:
Aimed at international buyers and for international sales. <u>This trailer should tell the story, be direct, and sell the whole movie in 60-120 seconds</u>. No over the top gore or nudity.  For examples of trailers that have had success in the international market please check out "Filth to Ashes, Flesh to Dust", "God of Vampires", "Lost Woods", and "Deadfall Trail" on the Acort International website (AcortInternational.com).
• <u>Other trailers:</u>
Feel free to submit other trailer versions, but not more than 5.  No trailers/teasers/promos should be less than 30 seconds or more than 3 minutes.
**Trailers are extremely important!!!** Keep in mind that your film is only as good as your trailer from a sales standpoint. Most retailers and consumers use trailers when deciding whether or not to rent or buy your film. The better your trailer is the better chance we have of selling it. Good trailers = good sales!
**Trailers for HD features should be HD as well.**
**• M&E Track:**
M&E Tracks, if available, should be provided as a separate file in uncompressed WAV or AIFF format at the highest quality possible.  It should sync up perfectly with the feature master.
<u>All Audio Levels shall be maintained such that the headroom of the system is not exceeded.</u>

**Please indicate here whether or not you will be providing a separate M&E track:**

11                                                                    Initial _PJP_  _TÆG_

____ Yes      ____ No

**• Commentary Track for DVD:**
See above (M&E Track) for format requirements. This is not required.

**• Bonus Materials for DVD:**
Not required but highly recommended. We are not as strict on formatting for these files and can work with pretty much anything. If you have any audio/video loops or graphic elements you'd like to be used for the authoring please include them. See below for more information on self-authoring if you're interested in doing that.

**• Images and Other Artwork:**
Please provide at *least* 20 images from the film or production (behind-the-scenes). The higher quality the better and we accept any common format. Any other artwork related to the film or production is good too. The more the better.

**• Documents:**
Please include all applicable and available documents on the checklist above. Any common format is accepted. Please use the included spreadsheet template for metadata information. If the metadata spreadsheet wasn't included contact your rep.
Any music in the film **must be properly** licensed from the respective rights owner.

**IMDb, Official Websites, Social Media**
IMDb is the Licensor's responsibility. Please make sure all information is current, listed correctly, and with artwork. It will assist us in sales and promotion. Websites for your film, as well as social media pages, are also your responsibility, though we may utilize our social networks to promote your film as well.

**Self-Authoring (DVD)**
We recommend having our professional in-house authoring department produce your DVD, however if you have the ability to author the DVD to industry and our quality standards you're welcome to do that. Any self-authoring jobs are subject to our approval. If you self-author you must include one QC'd master disc image file in .ISO format, as well as your project files.
In almost all cases we do not release DVD9's.

**Delivery Schedule**
Licensor shall deliver the complete "Deliverable Materials" to Licensee no later than thirty (30) days after the execution of this Agreement. The Metadata Spreadsheet must be provided to the Licensor within 7 days of execution.

**Contact Information**
**Reese Lester**
**+1 (480) 966-4070 x16  •  ReeseL@emaximmedia.com**
**6929 N. Hayden Rd. Suite C4-246**
**Scottsdale, AZ 85250 USA**
**Simple Master Checklist**
This page is for your convenience and is not required to be sent with your materials. The previous pages contain a lot of information, so this checklist boils everything down to exactly what needs to be on the hard drive shipped to us.

12                                                                    Initial ₧₧   ᵀᶻᵉᵀ

☐ **Hard drive casing labeled with:**
    ☐Title
    ☐Aspect ratio, resolution, frame rate, file size
    ☐TRT
    ☐Drive Format (Mac or PC)
    ☐Production Company/Contact

☐ **Folders and files on hard drive well organized and labeled**
   **All files include the title or title's acronym**

☐ **Documents:**
    ☐Dialog sheets and/or accurate script
    ☐Music cue sheet
    ☐Music clearance/release documents
    ☐Copyright documents (if available)
    ☐Metadata spreadsheet(s)

☐ **Feature master:**
    ☐Meets format requirements
    ☐Includes full audio mix with dialog

☐ **Two trailers, to same specs as the feature master**

☐ **M&E-only audio tracks if available**

☐ **Bonus materials for DVD if available**

☐ **At least 20 images (frame grabs, production stills, etc)**
   **Any other artwork if available**

Contact Information
Reese Lester
+1 (480) 966-4070 x16  •  ReeseL@emaximmedia.com
6929 N. Hayden Rd. Suite C4-246
Scottsdale, AZ 85250 USA

13                                Initial _PJP_   _____

**EXHIBIT D**

Content Licence Agreement between VA Media Pty Ltd and Bruder Releasing, Inc

dated April 25/26, 2025

**TERMS AND CONDITIONS**

### 1.    DEFINITIONS

1.1    In this Agreement:

**"Advertisements"** means advertisements served with, in, on or in relation to the Licensor Content, including pre-roll, in-stream, post-roll, overlay and synchronized banner advertisements that have been sold specifically against the Licensor Content (as opposed to, for example, banner advertisements and advertising inventory appearing on Platforms that are not directly and specifically sold against the Licensor Content, and excluding Sponsor Integrations).

**"Agreement"** means this agreement consisting of:

(a)    the Commercial Details; and

(b)    these Terms and Conditions.

**"AVOD"** means advertising video on demand;

**"Claim"** includes any claim, demand, action, proceeding, litigation, investigation or judgment of any nature.

**"Commercial Details"** means the commercial details at the start of this Agreement.

**"FAST"** means free ad-supported streaming television;

**"GST"** has the meaning defined in the GST Law.

**"GST Law"** has the meaning given to that term in the A New Tax System (Goods and Services Tax) Act 1999 (Cth).

**"Intellectual Property Rights"** includes any copyright works (including future copyright works), trademarks, registrable or non-registrable designs and any developments, alterations or improvements of such works, marks, designs or rights.

**"Licensed Platforms"** means the Platform/s specified under that heading in the Commercial Details;

**"Licensor Account"** means the bank or PayPal account set out under that heading in the Commercial Details.

**"Licensor Content"** means the audio visual content referred to under that heading in the Commercial Details;

**"Licensor Ad Revenue Share"** means the revenue share set out under that heading in the Commercial Details;

**"Licensor Sponsorship Revenue Share"** means the revenue share set out under that heading in the Commercial Details;

**"Loss"** means any damage, loss, liability, expense or cost (including legal costs) whether direct or indirect, consequential or incidental.

**"Net Ad Revenue"** means the revenue (excluding GST) earned and actually received by VA Media from the placement of Advertisements, after deduction of any commissions or revenue shares retained by Platform Operators.

**"Net Sponsorship Revenue"** means the revenue (excluding GST) earned and actually received by VA Media from the placement of Sponsor Integrations, less any editing and production costs incurred by VA Media in relation to the creation of the Sponsor Integrations.

**"Platform"** means an online platform or service which distributes audio visual content, including platforms which operate on an AVOD or FAST basis.

**"Platform Operator"** means the company or other person which operates a Platform;

**"Sponsor Integration"** means sponsorship messaging or content which is edited into an item of Licensor Content by VA Media on behalf of a sponsor (as opposed to Advertisements which are sold against Licensor Content but not edited into it). By way of example, a Sponsorship Integration could be the addition of a short audio-visual sponsorship message such as "This episode is brought to you by [sponsor name]" which is added at the start of an item of Licensor Content.

**"Sub-Licensing Receipts"** means all revenue received by VA Media from sub-licences of Licensor Content to third parties under clause 3A.

**"Term"** means the term set out under that heading in the Commercial Details, plus any extension which may be applicable under these Terms and Conditions.

**"VA Media Site"** means a channel, account or page on a Licensed Platform which VA Media operates and controls for the purpose of distributing audio-visual content (but not including channels, accounts or pages VA Media manages on behalf of third parties);

## 2. INTERPRETATION

**2.1** In these Terms and Conditions:

(a)     a reference to the singular includes the plural and vice versa;

(b)     a reference to a given gender includes all other genders;

(c)     other parts of speech and grammatical forms of a word or phrase defined in these Terms and Conditions have a corresponding meaning;

(d)     use of the word including and similar expressions are not, nor are they to be interpreted as, words of limitation;

(e)     a reference to a person includes a natural person, a company or other entities recognised by law;

(f)     a reference to any agreement or document is to that agreement or document (and, where applicable, any of its provisions) as amended, novated, supplemented or replaced from time to time;

(g)     all references to parties are to the parties to this Agreement;

(h)     a reference to a party includes the party's executors, administrators, successors and permitted assigns;

(i)     where any obligation is imposed on, or any benefit takes effect for, two or more persons, the obligation binds or takes effect for the benefit of (as the case may be) those persons jointly and each of them severally;

(j)     in the event of inconsistency, the following order of priority will apply to the Agreement:

    (A)     these Terms and Conditions; then

    (B)     the Commercial Details.

## 3.     LICENCE OF RIGHTS

**3.1**     The Licensor grants VA Media a licence, throughout the Territory and during the Term, to include the Licensor Content on VA Media Sites and to make it available for viewing by consumers on VA Media Sites. This licence includes the right to reproduce, communicate to the public, edit and otherwise use and exploit the Licensor Content as reasonably necessary for the purpose of making it available for viewing on VA Media Sites, including in conjunction with Advertisements.

**3.2**     The licence in clause 3.1 will be of the type specified in the section headed "Type Of Licence" in the Commercial Details.

**3.3**     VA Media may:

(a)     edit Licensor Content to remove colour bars and credits in order to comply with Platform regulations and operating standards/requirements;

(b)     edit Licensor Content to remove any scenes which contain violence or other material which VA Media reasonably believes, based on its dealings with Platform Operators, is likely to significantly lessen the potential revenue from Advertisements; and

(c)     create compilation videos for use on VA Media Sites which combine portions of different items of Licensor Content;

(d)     edit Licensor Content to create short-form content for use on VA Media Sites (for example, a short clip or an individual scene from an item of Licensor Content, which is placed on a VA Media Site separately from the full-length item of Licensor Content);



## CONTENT LICENCE AGREEMENT

This Content Licence Agreement is made up of the Commercial Details below and the attached Terms And Conditions.

### COMMERCIAL DETAILS:

| | |
|---|---|
| **Date of Agreement** | The date this Agreement is signed by the last party to sign. |
| **Licence Period Start Date** | Date of Agreement |
| **Term** | 3 years commencing on the Licence Period Start Date (the "Initial Period"), extending automatically for subsequent periods of one year (each a "Renewal Period") unless either party gives written notice of termination of the Term at least 60 days prior to the end of the Initial Period or the then-current Renewal Period. If such notice is given, the Term will end at the end of the Initial Period or the then-current Renewal Period, as applicable. |
| **VA Media** | VA Media Pty Ltd ACN 650 666 738<br>Level 3, 171 William Street<br><br>Darlinghurst 2010<br><br>Australia |
| **VA Media contacts** | Mark Ashbridge<br>mark@vamedianetwork.com |
| **Licensor** | Bruder Releasing, Inc<br>79585 Baya<br>La Quinta<br>CA 92253<br>USA |
| **Licensor contacts** | Marc Bruder<br>bruder@brivideo.com |
| **Licensor Account** | |

| | |
|---|---|
| | |
| **Licensor Content** | The items of audio-visual content listed in Schedule 1, and any other items of audio-visual content which the Licensor supplies to VA Media during the Term and approves in writing for use on VA Media Sites. |
| **Licensed Platforms** | YouTube |
| **Type Of Licence** | Non-Exclusive |
| **Licensor Ad Revenue Share** | |
| **Licensor Sponsorship Revenue Share** | |
| **Sub-Licensing Revenue Share** | |
| **Territory** | As set out in Schedule 1, for each item of Licensor Content |
| **Email addresses for notices** | VA Media: mark@vamedianetwork.com<br><br>Licensor: bruder@brivideo.com |
| **Previous Agreements** | The parties to the following agreements agree that they are now terminated, effective on upon execution of this Agreement:<br><br>1. Content Licence between the Licensor and Valleyarm Digital Limited dated 5 March 2020;<br><br>2. Content Licence between the Licensor and VA Media dated 30 June 2022. |

**EXECUTED by VA MEDIA PTY LTD**

*Mark Ashbridge*

------------------------------------

Signature of Managing Director

Mark Ashbridge

------------------------------------

Name of Managing Director

Date: April 26 2025

**EXECUTED by VALLEYARM DIGITAL LIMITED**

*Mark Ashbridge*

------------------------------------

Signature of Managing Director

Mark Ashbridge

------------------------------------

Name of Managing Director

Date: April 26 2025

**EXECUTED on behalf of the Licensor by its authorised officer:**

| |
|---|
| *[signature]* |
| Signature of Authorised Officer |
| |
| Marc Bruder |
| Name of Authorised Officer |
| Date:    April 25, 2025 |

(e)    use excerpts from the Licensor Content not exceeding three minutes, and stills from the Licensor Content, for non-monetized promotional purposes in connection with VA Media Sites, not only on VA Media Sites but also in all other online platforms and media; and

(f)    edit Sponsor Integrations into Licensor Content.

3.4    If the Licensor has appointed any third party to provide content ID management services to the Licensor in respect of Licensor Content (a "Content Manager"), the Licensor must notify the Content Manager in writing promptly after execution of this Agreement that it has entered into this Agreement with VA Media, and request that the Content Manager takes all necessary steps to ensure that when the Licensor Content is uploaded to VA Media Sites, this will not trigger any copyright claims or other adverse notifications to the Platform Operator from the Content Manager.

3.5    In the event that a Content Manager or other third party seeks at any time to challenge VA Media's right to place any Licensor Content on a VA Media Site in accordance with this Agreement, or otherwise takes any action with a Platform Operator seeking to block or remove any Licensor Content from a VA Media Site during the Term, the Licensor agrees that VA Media may send to the third party the letter attached to this Agreement as Annexure A (which the Licensor will execute at the same time it executes this Agreement).

## 4.    REVENUE SHARE - ADVERTISEMENTS

4.1    VA Media will pay the Licensor Ad Revenue Share to the Licensor in respect of all Net Ad Revenue received by VA Media in respect of the placement of Advertisements in relation to Licensor Content that is included on a VA Media Site.

4.2    VA Media is exclusively entitled to make all decisions regarding the placement of Advertisements on the VA Media Sites and to collect all income generated by such placement from the relevant Platform Operator.

## 5.    REVENUE SHARE – SPONSOR INTEGRATIONS

5.1    VA Media will pay the Licensor Sponsorship Revenue Share to the Licensor in respect of all Net Sponsorship Revenue received by VA Media in respect of the placement of Sponsor Integrations in Licensor Content which is included on a VA Media Site.

5.2    VA Media is exclusively entitled to make all decisions regarding the placement of Sponsor Integrations in the Licensor Content and to collect all income generated by Sponsor Integrations from the relevant sponsor.

5.3    The Licensor is not entitled to any share of revenue earned by VA Media from sponsorships other than Sponsor Integrations (for example sponsorships of an entire VA Media Site or of an entire playlist on a VA Media Site).

## 6A    SUB-LICENSING

**6A.1**  The Licensor agrees that VA Media may, during the Term, sub-license the Licensor Content to third parties who operate channels on Licensed Platforms, for distribution of the Licensor Content to consumers on those channels.

**6A.2**  Sub-Licences granted by VA Media under clause 6A.1:

    (a)  will, unless the Licensor otherwise agrees in writing, be limited to the Territory for which the relevant Licensor Content is licensed to VA Media under this Agreement;

    (b)  will, unless the Licensor otherwise agrees in writing, be limited to a term no longer than the Term of this Agreement;

    (c)  will include the right for the relevant third party licensee to promote the relevant Licensor Content via all media worldwide, including on TikTok, Instagram and other social media platforms and including by using stills and excerpts of up to three minutes from the Licensor Content, and any trailers, key art or other promotional materials supplied by the Licensor to VA Media (which the Licensor will supply to VA Media if available and reasonably requested by VA Media in connection with a third party sub-licence).

## 6.    ACCOUNTING AND PAYMENT

**6.1**  VA Media will account to the Licensor for any amounts due to the Licensor under this Agreement within 60 days following of the end of the month in which the applicable Net Ad Revenue, Net Sponsorship Revenue or Sub-Licensing Revenue was received.

**6.2**  All amounts payable to the Licensor under this Agreement will be paid to the Licensor Account.

## 7.    LICENSOR OBLIGATIONS

**7.1**  The Licensor will, at the Licensor's cost, deliver any future agreed Licensor Content listed in Schedule 1 to VA Media in the technical formats specified in Schedule 2.

**7.2**  The Licensor will also provide VA Media with any information it reasonably requests regarding the Licensor Content.

**7.3**  The Licensor warrants to VA Media that it:

    (a)  has full right, power and authority to enter into this Agreement

    (b)  has all necessary licences and approvals in connection with the Licensor Content and its use under this Agreement, including all licences and approvals from participants, directors and other contributors to the Licensor Content, and from the relevant rightsholders in respect of any copyright works or other underlying material included within the Licensor Content;

    (c)  the Licensor Content and its use pursuant to this Agreement will not infringe the Intellectual Property Rights or other rights of any third party, or any law; and

    (d)  the Licensor Content does not contain any defamatory or obscene material, or any material that is in the public domain.

7.4    The Licensor will notify VA Media in writing at least 14 days in advance if for any reason the Licensor's rights in any of the Licensor Content will terminate. Exceptions to this may be made with VA Media's approval.

7.5    The Licensor will notify VA Media in writing immediately if any third party claim is made in relation to any of the Licensor Content, which is inconsistent with and/or which might adversely affect the rights in the Licensor Content granted to VA Media in this Agreement.

7.6    The Licensor hereby indemnifies VA Media from and against Claims or Losses which may be made or brought against or suffered or incurred by VA Media as a result of breach by the Licensor of its warranties or obligations under this Agreement.

## 8.    LIMITATION OF LIABILITY

8.1    To the maximum extent permitted by law:

(a)    VA Media limits its total liability to the Licensor for any and all Losses or Claims in connection with this Agreement to the amount of Net Ad Revenue and Net Sponsorship Revenue generated during the Term which is retained by VA Media as its commission after deduction of the Licensor's share of that Net Ad Revenue and Net Sponsorship Revenue pursuant to clauses 4 and 5; and

(b)    This liability excludes any indirect, consequential, special or incidental loss or damages.

## 9.    INTELLECTUAL PROPERTY

9.1    Intellectual Property Rights owned by the Licensor in Licensor Content will remain the property of the Licensor, and VA Media acknowledges that nothing in this Agreement transfers title in or ownership of any Licensor Content to VA Media.

## 10.    TERMINATION

10.1    Either party may terminate this Agreement by giving written notice to the other, if that other party:

(a)    breaches any material term of this Agreement and, having been given 30 days' notice requiring the party to rectify the breach, fails to do so; or

(b)    enters into liquidation or bankruptcy or is declared insolvent in any legal proceedings.

10.2    VA Media may terminate this Agreement immediately by written notice to the Licensor in the event of any breach of the Licensor's warranties under this Agreement, including:

(a)    a third party lodging a copyright infringement notification with YouTube in relation to any Licensor Content, which YouTube upholds;

(b)    a third party Content ID Claim being made in respect of any Licensor Content which is on YouTube, which claim is valid; or

(c)    anything analogous to (a) or (b) above occurring in relation to any Licensed Platform other than YouTube.

**10.3**    Without limiting VA Media's rights under clause 10.2, VA Media may, if any of the events referred to in clause 10.2 occurs in relation to any particular Licensor Content, remove that Licensor Content from all relevant VA Media Sites.

## 11.    NOTICES

**11.1**    All notices required under this Agreement will be in writing and forwarded to the address or email addresses of the parties set out in this Agreement, or such other address or email addresses notified to the other party in writing from time to time. Such notices will be deemed to have arrived within two working days after posting by mail, at the time of delivery if by hand and, if sent by email, at the time recorded by the sender's server. Notwithstanding this, where any notice is delivered by hand or by email after 5pm on any day or is hand delivered or emailed on a Saturday or Sunday, the notice shall be deemed received on the next business day.

**11.2**    Emails will be deemed served in accordance with Clause 11.1 notwithstanding receipt by the sender from the recipient's email address of an automated (or other) notification of the receiver's absence.  Delivery by email will not have been effected if:

(a)    the intended recipient promptly informs the sender that the email was received in an incomplete form; or

(b)    the server report of the sender indicates a faulty or incomplete transmission of the email.

**11.3**    Notices sent by email must be sent to the email address for notices to the relevant party which is set out in the Commercial Details.

## 12.    TAX

**12.1**    All amounts payable under this Agreement are exclusive of GST which shall be paid in addition to any amount specified as payable, but only on receipt of a valid tax invoice requesting such payment.

**12.2**    The Licensor acknowledges that if applicable pursuant to Australian taxation laws, VA Media may be required to withhold a percentage of the amounts payable to the Licensor under this agreement in withholding tax. VA Media agrees to withhold no more than the minimum required to be held by law and to provide all documents to the Licensor as may be useful to the Licensor in filing tax returns in respect of any such tax withheld.

## 13.    GENERAL

**13.1**    This Agreement constitutes the entire agreement between the parties.

**13.2**    This Agreement may only be varied in writing by the parties.

**13.3**    VA Media may assign or sub-license its rights under this Agreement to any other person.

**13.4**    This Agreement does not create a relationship of employment, partnership or joint venture between the parties.

**13.5**  Except as required by law, the parties must not disclose to any person without the other party's prior written consent the terms of this Agreement or any other information relating to the other party which is confidential, or would reasonably be assumed to be confidential and which is not otherwise in the public domain.

**13.6**  Any provision of this Agreement which is or becomes unenforceable in any jurisdiction will be ineffective without invalidating any other provision of this Agreement, and such unenforceability will not invalidate that provision in any other jurisdiction.

**13.7**  All waivers must be in writing. A single or partial exercise or waiver by a party of a right relating to these terms and conditions does not prevent any other exercise of that right or the exercise of any other right.

**13.8**  The warranties and indemnities contained in this Agreement are continuing obligations and will survive the termination of this Agreement.

**13.9**  This Agreement will be governed by and construed in accordance with the laws of New South Wales, Australia and the parties submit to the non-exclusive jurisdiction of the courts of New South Wales.

**Schedule 1 - Initial Licensor Content**

| Title | Territory |
|---|---|
| #BFF's | WW |
| 180 Days | WW |
| A Guy Named Rick | WW |
| A Mighty Merry Christmas | WW |
| A Spell On You | WW ex Latin America |
| Acid Babylon | WW |
| Agent 203 | US |
| All For One | WW |
| Amacabra | WW |
| Amazing Wizard of Paws | WW |
| An Angel Named Billy | WW |
| Anna Karenina | Australia,Canada,Indonesia,India,New Zealand,Philippines,United States |
| Arachnicide | WW |
| Arena Movediza | WW |
| Argel | WW |
| Armynel | WW |
| Astaroth: Female Demon | WW |
| Bar Talk | WW |
| Beautiful Prision | WW |
| Beauty and the Beast | Australia,Canada,Indonesia,India,New Zealand,Philippines,United States |
| Before Time, The | WW |
| Behind The Veil | WW |
| Behind The Veil 2 | WW |
| Bette Davis Ain't For Sissies | WW |
| Bittersweet Days | WW |
| Black Mass Of The Brain | WW |
| Blood Freaks | WW |
| Blood Of The Mummy | WW |
| Bright Eyes | WW |
| Calloused Hands | WW |
| Camino De Santa Fe | WW |
| Children Of Summer | WW ex Latin America |
| Christmas Angel | WW |
| Cinderella | Australia,Canada,Indonesia,India,New Zealand,Philippines,United States |
| Circles | WW |
| Claire And Francis | US + CA |

| | |
|---|---|
| Claire And Francis - Full Mini-Series | US + CA |
| Classic Quickies | WW |
| Close Encounters of the 4th Kind: Infestation from Mars | Australia,Canada,Indonesia,India,New Zealand,Philippines,United States |
| Cold Eyes Of Fear | Andorra,Albania,Austria,Australia,Åland Islands,Bosnia & Herzegovina,Belgium,Bulgaria,Belarus, Switzerland,Cyprus,Czechia,Germany, Denmark,Estonia,Spain,Finland,Faroe Islands,France,United Kingdom,Guernsey,Gibraltar,Greece,Cr oatia,Hungary,Ireland,Isle of Man,Iceland,Italy,Jersey,Liechtenstein, Lithuania,Luxembourg,Latvia,Monaco, Moldova,Montenegro,North Macedonia,Malta,Netherlands,Norway, New Zealand,Poland,Portugal,Romania,Serb ia,Russia,Sweden,Slovenia,Svalbard & Jan Mayen,Slovakia,San Marino,Ukraine,Vatican City |
| Confessions From The Grassy Knoll: The Shocking Truth | WW |
| Confessions Of An Assassin | WW |
| Creeping Crawling | WW |
| Dark Seduction | WW |
| Dark, Deadly & Dreadful | WW |
| Dead Girls | WW |
| Dead on Appraisal | WW |
| Deadly Control | WW |
| Deadly Karma | WW |
| Deadly Renovations | WW |
| Death Factory | WW |
| Death Factory: Bloodletting | WW |
| Death of a Ghost Hunter | WW |
| Defending The Dark: Preserving The Night Sky | WW |
| Delirium | WW |
| Desecration | WW |
| Desperate Love (AKA Losing Lerato) | WW ex Africa, Latin America |
| Destined to be Ingested | WW |
| Destino Anunciado | WW |
| Diabolique | WW |

| | |
|---|---|
| Dolores | WW |
| Don't Fumble Me Twice | WW |
| Dracula: The Impaler | WW |
| Drunken Moon | WW |
| Dulcinea | WW |
| Edwin | WW |
| El Camino A Bali | WW |
| El Extraño Amor De Martha Ivers | WW |
| El Forajido | WW |
| El Inspector General | WW |
| El Lado Salvaje | WW |
| El Secadero De Iguanas | WW |
| El Terror | WW |
| El Tiempo De Los Monstruos | WW |
| Entity | WW |
| Eternal Damn Nation | WW |
| Eternamente Tuya | WW |
| Far From The Apple Tree | WW |
| Father May I | WW |
| Father May I 2 | WW |
| Father May I 3 | WW |
| Files On JFK | WW |
| Flesh, TX | WW |
| Frankenstein | WW ex Greece |
| From Beneath | WW |
| Gangster Exchange | WW |
| Gay Getaways | WW |
| Ghoul Scout Zombie Massacre | WW |
| Goodnight | WW |
| Ha Nacido Una Estrella | WW |
| Hamlet's Ghost | WW ex South Korea |
| Hechos El Uno Para El Otro | WW |
| Hide the Sausage | WW |
| Hollywood Betrayed | WW |
| Hope | WW |
| House Of Horrors: Gates Of Hell | WW |
| I Am Love | WW |
| I Am That Man | WW ex AUS |
| I Remember The Footprints In The Snow | WW |
| I Shot JFK: The Shocking Truth | WW |
| Index Inferno | WW |

| | |
|---|---|
| Inside the Mind of a Psychopath | WW ex Latin America |
| Intersect | WW |
| Killin Smallz | WW |
| Kings & Queens | WW |
| Kiss The Boys | WW |
| La Burla Del Diablo | WW |
| La Casa Encantada | WW |
| La Casa Roja | WW |
| La Noche De Los Muertos Vivientes | WW |
| La Pequeña Tienda De Los Horrores | WW |
| La Rusa | WW |
| La Segunda Mujer | WW |
| La Última Vez Que Vi París | WW |
| Less Than - The Documentary On Poverty In America | WW ex China, Taiwan |
| Let's Go See | WW |
| Light Years Away | WW |
| Lockdown: 2025 | WW |
| Los 39 Pasos | WW |
| Los Amores Cobardes | WW |
| Los Pecados De Harold Diddlebock | WW |
| Lost Woods | WW |
| Love, Spies And Cyanide | WW |
| Loving Martin | WW |
| Luna Nueva | WW |
| Mary Of Nazareth | US |
| Mi Morena Favorita | WW |
| Mi Querida Secretaria | WW |
| Million Dollar Nomad | WW ex Latin America, China |
| Misfits | WW |
| Miss Castaway and the Island Girls | WW |
| Mommy's Dollhouse | WW |
| Monster Loving Maniacs | US |
| Mr Crispin | WW |
| Musolini's Daughter | US, CA, ANZ, Phil |
| Mutant Swinger From Mars | WW |
| Neander-Jin: The Return Of The Neanderthal Man | WW |
| Night Kaleidoscope | WW |
| No Filter | WW |
| Offline | WW |

| | |
|---|---|
| Once There Was A Winter | WW |
| One Last Game | WW |
| One Thousand and One Nights | Australia,Canada,Indonesia,India,New Zealand,Philippines,United States |
| Orchard End Murder | Andorra,Albania,Austria,Australia,Åland Islands,Bosnia & Herzegovina,Belgium,Bulgaria,Belarus, Switzerland,Cyprus,Czechia,Germany, Denmark,Estonia,Spain,Finland,Faroe Islands,France,United Kingdom,Guernsey,Gibraltar,Greece,Cr oatia,Hungary,Ireland,Isle of Man,Iceland,Italy,Jersey,Liechtenstein, Lithuania,Luxembourg,Latvia,Monaco, Moldova,Montenegro,North Macedonia,Malta,Netherlands,Norway, New Zealand,Poland,Portugal,Romania,Serb ia,Russia,Sweden,Slovenia,Svalbard & Jan Mayen,Slovakia,San Marino,Ukraine,Vatican City |
| Parada De Silbato | WW |
| Parasite | WW |
| Paul VI - The Pope In The Tempest (Spanish) | US |
| Peace River | WW |
| Phantasmagoria 1 | WW |
| Phantasmagoria 2 | WW |
| Pinocchio | US, CA, AUS, NZ, Philippines |
| Planet of the Astronauts | WW |
| Poison Lover | WW |
| Powerplegic | WW |
| President's Day | WW |
| Psychotic | WW |
| Puesto De Avanzada En Marruecos | WW |
| Que Pelo Más Guay | WW |
| Rabid Love | WW |
| Raking, The | WW |
| Reanimator Academy | WW |
| Recognize | WW |
| Recognize 2: It Ain't Over Until You Recognize | WW |
| Red Call | WW |
| Red Pill | WW |

| | |
|---|---|
| Red Tail Reborn | WW |
| Revenge Of The Dead | WW |
| Revengers | WW |
| Rio Pride | WW ex Brazil |
| Romeo and Juliet | Australia, Canada, Indonesia, India, New Zealand, Philippines, United States |
| Saint Phillip Neri (Spanish) | US |
| Santa's Second Wife | WW |
| Santa's Second Wife (Spanish) | WW |
| Scissors | WW |
| Service | WW |
| Sherlock Holmes: Vestida Para Matar | WW |
| Shevernatze | WW |
| Shoot The Hero | WW |
| Sister Angela's Girls (Spanish) | US |
| Skyquake | WW |
| Snatched | WW |
| Sol | WW |
| Soraya | US, CA, ANZ, Phil |
| Space War On Christmas | WW |
| Spies, Hoods, And The Hidden Elite | WW |
| Story Of Godia | WW |
| Sugar Daddy | US + CA |
| Swap Out | WW |
| Take Me To Banaue | WW |
| The Bleed | WW |
| The Body Remembers When The World Broke Open | US + CA |
| The Boss Hunt (Spanish) | US |
| The Century Plaza | WW |
| The Crusaders | US, CA, Philippines, Oceania |
| The Extraordinary Adventures Of Jules Verne | US, CA, Philippines, Oceania |
| The Extraordinary Adventures Of Jules Verne (Spanish) | US, CA, Philippines, Oceania |
| The Gifts of Christmas | WW |
| The House: Director's Cut | WW |
| The Ideal | WW |
| The Invocation Of Enver Simaku | WW |
| The Jailhouse Jerky Crew | WW |
| The Jersey Sound | WW |
| The Miracle Centre | WW |

| | |
|---|---|
| The Other Barrio | WW ex Latin America, China |
| The Random Factor | WW |
| The Representative | WW |
| The Restorers | WW |
| The Stolen Dream | US, CA, AUS, NZ, Philippines |
| The Washer | WW |
| Time Again | WW |
| Tit For Tat | WW |
| Tormented | WW |
| Tu Y Yo | WW |
| Tulsa | WW |
| Turn Of The Blade | WW |
| Turning Point | WW |
| Un Cubo De Sangre | WW |
| Visions Of California | WW |
| Wedding Day | WW |
| Winds Of Silence | WW |
| Witches Brew | WW |

**Schedule 2 - Delivery specifications**



| Content Delivery Preferred Specs | |
|---|---|
| File Format | MPEG-4/MP4 |
| Video Codec | H.264<br>(Do not deliver ProRes unless previously discussed) |
| Aspect Ratio | 16:9 |
| Video Resolution | 1920 x 1080 (minimum resolution) |
| Video Bitrate | 8-10 Mbps (1080p upload) |
| Video Scan | Progressive (no interlacing) |
| Colour bars / slates / countdowns / ad breaks | None – Please remove |
| Audio Codec | AAC |
| Audio Bitrate | 128kbps or better |
| Audio Channels | Stereo |
| Audio Sample Rate | 96khz or 48khz |
| Key Art/ Posters / Logos | 1920 x 1080 px<br>Preferred: PSD<br>Accepted: JPG, PNG<br>Landscape where possible |
| Closed Captions | SCC, SRT<br>(CC not mandatory but helpful if available) |
| Rights Documentation | Music cue sheets, or soundtrack license documentation<br>(not mandatory but preferred for copyright claims management) |
| VA Media will provide a Media Shuttle portal link for content delivery | |

**ANNEXURE A**

See attached

Bruder Releasing, Inc
79585 Baya
La Quinta
CA 92253
USA

**TO WHOM IT MAY CONCERN:**

This letter is to inform you that, pursuant to a licensing agreement dated on or about the date of this letter (the "Licensing Agreement"), we have licensed the titles specified in the attached Schedule 1 (the "Titles") to VA Media Pty Ltd ("VA Media"), in the territories specified in the attached Schedule 1 (the "Territories"), for exploitation via channels, accounts and pages operated by VA Media on the platforms listed below ("VA Media Sites").

**YouTube**

We request that, until we notify you in writing that the term of the Licensing Agreement has ended, you do not take any steps to block the Titles from appearing on the VA Media Sites, or to have the Titles taken down from the VA Media Sites, or to otherwise prevent VA Media from exercising its right under the Licensing Agreement to include the Titles on the VA Media Sites.

**Signed on behalf of Bruder Releasing, Inc**

Marc Bruder

April 25, 2025

Date